**No. 24-60304**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Breeze Smoke, L.L.C; Texas Wholesale,

*Petitioners,*

v.

Food & Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human services; Marty Makary, Commissioner, U.S. Food & Drug Administration

*Respondents.*

consolidated with

No. 24-60332

Vertigo Vapor, L.L.C., doing business as Baton Vapor; Max & Zach's Vapor Shops Incorporated

*Petitioners,*

v.

Food & Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human services; Marty Makary, Commissioner, U.S. Food & Drug Administration

*Respondents.*

consolidated with

No. 24-60424

Lead by Sales, L.L.C., doing business as White Cloud Cigarettes JP-MAXX, L.L.C., doing business as Jail Puff Max,

*Petitioners,*

v.

Food & Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human services; Marty Makary, Commissioner, U.S. Food & Drug Administration

*Respondents.*

consolidated with

No. 24-60628

*Vapermate, L.L.C.; Vape Away, L.L.C.*

*Petitioners,*

v.

Food & Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human services; Marty Makary, Commissioner, U.S. Food & Drug Administration

*Respondents.*

consolidated with

No. 25-60098

Elite Brothers, L.L.C.; Clouds Vapors, L.L.C.,

*Petitioners,*

v.

Food & Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human services; Marty Makary, Commissioner, U.S. Food & Drug Administration

*Respondents.*

consolidated with

No. 25-60369

American Vapor Company, L.L.C.,

*Petitioners,*

v.

Food & Drug Administration; Marty Makary, Commissioner, U.S. Food and Drug Administration; United States Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services,

*Respondents.*

On Petitions for Review of Final Marketing Denial Orders
Issued by the U.S. Food and Drug Administration

**BRIEF OF *AMICI CURIAE* MEDICAL AND PUBLIC HEALTH GROUPS IN SUPPORT OF RESPONDENTS**

Dennis A. Henigan
Connor Fuchs
CAMPAIGN FOR TOBACCO-FREE KIDS
1400 I St. NW, Suite 1200
Washington, DC 20005
Tel: (202) 481-9366
Fax: (202) 296-5427
dhenigan@tobaccofreekids.org
cfuchs@tobaccofreekids.org

*Counsel for Amici Curiae*

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rules 29.2 and 28.2.1, the undersigned counsel of record for *amici curiae* certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1—in addition to those listed in the filings of the parties, *Amici Curiae* R.J. Reynolds Vapor Company et al., and *Amici Curiae* Vaping Industry Advocacy Groups and Stakeholders—have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. American Academy of Pediatrics

2. American Cancer Society Cancer Action Network

3. American Heart Association

4. American Lung Association

5. American Medical Association

6. Campaign for Tobacco-Free Kids

7. Louisiana State Medical Society

8. Parents Against Vaping

9. Truth Initiative

Pursuant to Fed. R. App. P. 26.1(a), *amici curiae* are all non-profit organizations committed to advancing the public health. No party to this filing has

i

a parent corporation, and no publicly held corporation owns 10% or more of the

stock of any of the parties to this filing.

/s/ Connor Fuchs
Connor Fuchs
Attorney of record for *Amici Curiae*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENTS ....................................1

INTERESTS OF *AMICI CURIAE* .........................................................4

I.   The MDOs Comply with the Tobacco Control Act and Are Not Otherwise Arbitrary and Capricious. ...................................................6

    A.   Consistent with the Tobacco Control Act, FDA denied Petitioners' applications because their products were not shown to be APPH. ............6

    B.   FDA reasonably concluded that Petitioners' products are not APPH. ......9

        1.   Petitioners' flavored e-cigarettes, including menthol, are attractive to youth.....................................................................................9

        2.   Petitioners' flavored e-cigarettes pose a direct threat of addiction and other health harms to young people. ...............................................12

        3.   Given the APPH standard, it was reasonable for FDA to require robust evidence that Petitioners' flavored e-cigarettes help smokers to stop smoking more effectively than tobacco-flavored products. .15

II.  FDA's Requirement of Strong Evidence that Petitioners' Flavored E-Cigarettes More Effectively Help Smokers to Stop Smoking than Tobacco-Flavored Products Was Not Required to Go Through Notice-and-Comment Rulemaking…......................................................................18

    A.   FDA's Evidentiary Requirement Is Not a Product Standard Under the TCA...................................................................................18

    B.   FDA's Evidentiary Requirement Was Not Required to Go Through Notice-and-Comment Rulemaking Under the APA. ............................20

III. FDA Did Not Violate the Major Questions Doctrine....................................24

CONCLUSION .................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*American Academy of Pediatrics v. FDA*,
379 F. Supp. 3d 461 (D. Md. 2019); 399 F. Supp. 3d 479 (D. Md. 2019), *appeal dismissed sub nom. In re Cigar Ass'n of Am*., 812 F. App'x 128 (4th Cir. 2020) ..................................................................................................................5

*Avail Vapor, LLC v. FDA*,
55 F.4th 409 (4th Cir. 2022)..................................................................16

*Breeze Smoke, LLC v. FDA*,
18 F.4th 499 (6th Cir. 2021)..................................................................10

*FDA v. Brown & Williamson*,
529 U.S. 120 (2000) ..............................................................................1

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ...............................................8, 11, 22, 23, 24

*Flight Training Int'l, Inc. v. Federal Aviation Administration*,
58 F.4th 234 (5th Cir. 2023)..................................................21, 22, 23

*Fontem US, LLC v. FDA*,
82 F.4th 1207 (D.C. Cir. 2023) ...........................................................9

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ............................................................12

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)................................................................................21

*Professionals and Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995)..................................................................21

*Prohibition Juice Co. v. FDA*,
45 F.4th 8 (D.C. Cir. 2022) ............................................................10, 14

*R.J. Reynolds Vapor Co. v. FDA*,
65 F.4th 182 (5th Cir. 2023)..................................................................20

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ..............................................................................23

*U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*,
708 F.3d 428 (2d Cir. 2013) ................................................................19

**Statutes**

5 U.S.C. 553(b)(A) ..............................................................................21

Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat.
1776 (2009) ....................................................................................1

21 U.S.C. § 387 note ............................................................................1

21 U.S.C. § 387g(a)(1)(A) ....................................................................19

21 U.S.C § 387g(a)(3)(A) ..............................................................18, 19

21 U.S.C. § 387g(a)(4) .........................................................................9

21 U.S.C § 387g(a)(4)(B) ....................................................................19

21 U.S.C. § 387j ...............................................................................18

21 U.S.C. § 387j(c)(2) .........................................................6, 9, 18, 25

21 U.S.C. § 387j(c)(2)(A) .....................................................................8

21 U.S.C. § 387j(c)(4) ........................................................2, 6, 8, 23

21 U.S.C. § 387j(c)(5) ..........................................................3, 4, 22

**Other Authorities**

Eunice Park-Lee et al., *E-Cigarette and Nicotine Pouch Use Among Middle and
High School Students – United States, 2024*, 73 MORBIDITY & MORTALITY
WKLY. REP. 774 (2024),
https://www.cdc.gov/mmwr/volumes/73/wr/pdfs/mm7335a3-H.pdf ............2, 12

FDA, *E-Cigarettes Authorized by the FDA* (last updated July 2025),
https://digitalmedia.hhs.gov/tobacco/hosted/Authorized-E-Cig-July2025.pdf
[https://perma.cc/6L8F-WLSG]. ................................................20, 24

FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products
After Extensive Scientific Review* (June 21, 2024), https://www.fda.gov/news-
events/press-announcements/fda-authorizes-marketing-four-menthol-flavored-
e-cigarette-products-after-extensive-scientific ...............................25

FDA, *FDA Denies Marketing for 65 "MNGO Disposable Stick" E-Cigarettes* (Apr. 15, 2024), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-denies-marketing-65-mngo-disposable-stick-e-cigarettes ...................................25

OFFICE OF THE SURGEON GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., ELIMINATING TOBACCO-RELATED DISEASE AND DEATH: ADDRESSING DISPARITIES: A REPORT OF THE SURGEON GENERAL (2024), https://www.hhs.gov/sites/default/files/2024-sgr-tobacco-related-health-disparities-full-report.pdf ...............................................................................1

## INTRODUCTION AND SUMMARY OF ARGUMENTS

As the U.S. Supreme Court has recognized, "the thousands of premature deaths that occur each year because of tobacco use" constitute "one of the most troubling public health problems facing our Nation . . . ." *FDA v. Brown & Williamson*, 529 U.S. 120, 125 (2000). Indeed, tobacco product use remains the leading cause of preventable death in the U.S., resulting in more than 490,000 deaths per year.[1] The tobacco industry has long understood that "young people are an important and often crucial segment of the tobacco market" since "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products." Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776, 1777-78 §§ 2(4) & (24) (2009) ("Tobacco Control Act" or "TCA"), 21 U.S.C. § 387 note (4) & (24). Today, youth tobacco use is fueled by e-cigarettes, particularly flavored products like Petitioners' Peach Soda- and Passion Fruit Orange Guava-flavored e-cigarettes. Pet. for Review, Ex. A at 4, *Breeze Smoke v.*

---

[1] OFFICE OF THE SURGEON GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., ELIMINATING TOBACCO-RELATED DISEASE AND DEATH: ADDRESSING DISPARITIES: A REPORT OF THE SURGEON GENERAL 9 (2024), https://www.hhs.gov/sites/default/files/2024-sgr-tobacco-related-health-disparities-full-report.pdf.

1

*FDA*, No. 24-60304 (5th Cir. June 14, 2024), ECF No. 1-1 (Ex. A is hereinafter referred to as "Breeze MDO").[2]

As detailed below, FDA properly denied authorization to Petitioners' flavored e-cigarettes because Petitioners did not demonstrate that the marketing of their products would be appropriate for the protection of the public health ("APPH")—a showing the Tobacco Control Act requires before a new tobacco product may be authorized and sold. In accordance with the TCA, FDA's review focused on the two competing factors the statute requires it to consider—(1) the likelihood that the product will help existing tobacco users stop using tobacco products versus (2) the likelihood that the product will lead non-tobacco users, including youth, to begin using such products. 21 U.S.C. § 387j(c)(4). Following a thorough review of the general literature and Petitioners' submitted data, FDA found overwhelming evidence that Petitioners' flavored e-cigarettes, including menthol, are highly attractive to youth—to a much greater degree than tobacco-flavored products—and pose serious risks of addiction and other health harms, particularly to young people. In contrast, FDA found the scientific literature to be conflicting on whether flavored products are more effective than tobacco-flavored e-cigarettes in helping adult

---

[2] Eunice Park-Lee et al., *E-Cigarette and Nicotine Pouch Use Among Middle and High School Students – United States, 2024*, 73 MORBIDITY & MORTALITY WKLY. REP. 774, 774 (2024), https://www.cdc.gov/mmwr/volumes/73/wr/pdfs/mm7335a3-H.pdf.

cigarette smokers to stop smoking. Given the statutory APPH standard and the powerful evidence of the appeal of flavored products to youth, it was entirely reasonable for FDA to require Petitioners to submit robust countervailing evidence of the benefit of their flavored products versus tobacco-flavored products in aiding smokers to stop smoking. It was not arbitrary and capricious, nor a violation of the Tobacco Control Act, for FDA to issue marketing denial orders ("MDOs") based on Petitioner's failure to provide such evidence.

Moreover, contrary to Petitioners' arguments, FDA's requirement that Petitioners supply robust evidence showing that their flavored e-cigarettes are more effective in helping smokers to stop smoking than tobacco-flavored products was not required to be promulgated through notice-and-comment rulemaking. It is not a product standard under the Tobacco Control Act because it does not prohibit the manufacture of e-cigarettes with flavors other than tobacco, as a product standard would do, but instead outlines the types of evidence that may be sufficient to market flavored e-cigarettes in the absence of a product standard. Nor is FDA's evidentiary requirement a legislative rule under the Administrative Procedure Act ("APA") and thus subject to notice-and-comment rulemaking. It is an interpretive rule that flows directly from the Tobacco Control Act's requirement that FDA determine whether the marketing of a product is APPH "when appropriate . . . on the basis of well-controlled investigations" or "other valid scientific evidence." 21 U.S.C. §

3

387j(c)(5). And even if this Court were to find that FDA's evidentiary requirement is a new regulatory standard, Supreme Court precedent makes clear that FDA had the discretion to announce this requirement either through adjudications (such as Petitioners' MDOs) or through a legislative rule subject to notice-and-comment rulemaking.

Finally, FDA's evidentiary requirement does not violate the major questions doctrine. As evidenced by FDA's authorization of multiple menthol e-cigarettes, the agency has not adopted a de facto ban on flavored e-cigarettes as Petitioners allege. Rather, as the TCA requires, FDA has denied authorization to Petitioners' products because their applications failed to demonstrate that the marketing of such products meet the statutory APPH standard. Therefore, this Court should uphold the MDOs.

## INTERESTS OF *AMICI CURIAE*[3]

*Amici* are the following nine national and state medical, public health, and community organizations: American Academy of Pediatrics, American Cancer Society Cancer Action Network, American Heart Association, American Lung Association, American Medical Association, Campaign for Tobacco-Free Kids, Louisiana State Medical Society, Parents Against Vaping, and Truth Initiative.

---

[3] This brief is filed with the consent of the parties. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* affirm that no party's counsel authored this brief, neither the parties nor their counsel contributed money intended to fund preparing or submitting this brief, and no person—other than *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

*Amici* include physicians who counsel young patients and their parents about the hazards of tobacco use, organizations with formal programs to urge users to quit, and groups representing parents and families struggling to free young people from nicotine addiction. Each of these organizations works on a daily basis to reduce the devastating health harms of tobacco products, including electronic nicotine delivery system ("ENDS" or "e-cigarette") products.[4] Accordingly, *amici* have a direct and immediate interest in ensuring that Petitioners' highly addictive and youth-appealing flavored e-cigarettes not be permitted on the market.  Upholding the MDOs will serve that interest.

Amici also have a special interest in this case because many of the *amici* were plaintiffs in *American Academy of Pediatrics v. FDA*, in which they obtained a federal court order: (1) establishing new deadlines for the required submission of premarket tobacco product applications for e-cigarette products, and (2) limiting the time period that e-cigarettes may remain on the market without the required premarket orders.  379 F. Supp. 3d 461 (D. Md. 2019); 399 F. Supp. 3d 479 (D. Md. 2019), *appeal dismissed sub nom. In re Cigar Ass'n of Am.*, 812 F. App'x 128 (4th Cir. 2020). *Amici* therefore have a strong interest in ensuring that the premarket review process functions to protect the public health by removing from the market flavored e-cigarettes, like Petitioners' products, that threaten the health and well-

---

[4] This brief uses the terms "e-cigarette" and "ENDS" interchangeably.

being of young people without sufficient countervailing evidence of any benefit to adult cigarette smokers.

## I. The MDOs Comply with the Tobacco Control Act and Are Not Otherwise Arbitrary and Capricious.

### A. Consistent with the Tobacco Control Act, FDA denied Petitioners' applications because their products were not shown to be APPH.

To secure marketing authorization for a new tobacco product under the Tobacco Control Act, an applicant must demonstrate, among other things, that the marketing of its product would be "appropriate for the protection of the public health" ("APPH"). 21 U.S.C. § 387j(c)(2). In making this APPH determination, the TCA requires FDA to consider:

> the risks and benefits to the population as a whole, including users and nonusers of the tobacco products, and taking into account—
>
> (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and
>
> (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

21 U.S.C. § 387j(c)(4).

Applying this framework to Petitioners' e-cigarettes, FDA found the evidence overwhelming that Petitioners' flavored e-cigarettes appeal to youth more than tobacco-flavored products. Given this unequivocal evidence, it was entirely reasonable for FDA to require Petitioners to submit "the strongest types of evidence" demonstrating that, as compared to tobacco-flavored products, their flavored

6

products benefit smokers by helping them to stop smoking cigarettes and to issue an MDO based on their failure to furnish such evidence. Technical Project Lead Review ("TPL Review") 6.[5]

The impact of a product on youth initiation is particularly critical because, as FDA noted in its TPL Reviews of Petitioners' products, "use of tobacco products, no matter what type, is almost always started and established during adolescence when the developing brain is most vulnerable to nicotine addiction." TPL Review 11. Whereas "almost 90 percent of adult daily smokers started smoking by the age of 18 . . . youth and young adults who reach the age of 26 without ever starting to use cigarettes will most likely never become daily smokers." TPL Review 11. As FDA reasonably concluded, "[b]ecause of the lifelong implications of nicotine dependence that can be established in youth, preventing tobacco use initiation in young people is a central priority for protecting population health." TPL Review 11.

Petitioners (Petrs' Br. 42-45) take issue with the "targeted review" FDA conducted to determine if their applications included "evidence that is capable of showing a sufficient benefit to adult smokers that could outweigh the known and substantial risk to youth from flavored ENDS (taking into account any applicant-

---

[5] This brief cites to the publicly available TPL Review issued to Petitioner Lead by Sales LLC d/b/a White Cloud Cigarettes. *See* Addendum to Opp'n to Mot. for Stay Pending Review, *Lead by Sales L.L.C. v. FDA*, No. 24-60424 (5th Cir. Oct. 7, 2024), ECF No. 30. "TPL Review #" refers to the page number of the Addendum. For example, "TPL Review 6" refers to page 6 of the Addendum.

proposed marketing restrictions or other mitigation measures).” TPL Review 11. However, as FDA explained, “without such a showing, it will not be possible for the application to establish that the marketing of the new products will be APPH.” TPL Review 11. FDA’s focus on evidence that could satisfy the APPH standard was entirely consistent with the TCA. Absent such evidence, FDA is statutorily required to deny an application. As the Supreme Court recently observed, “There are many reasons why the FDA may deny marketing authorization to a ‘new tobacco product,’ but of main importance here, the agency *must* deny an application unless it is shown that the product ‘would be appropriate for the protection of the public health.’” *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 552 (2025) (emphasis in original) (quoting 21 U.S.C. § 387j(c)(2)(A)).

To support their claim that FDA’s reviews failed to consider certain required information, Petitioners cite inapplicable provisions of the TCA. Petrs’ Br. 43-44. First, citing 21 U.S.C. § 387j(b)(1), Petitioners assert that the “TCA enumerates numerous forms of evidence relevant to APPH, including data on health risks, ingredient and additive information, manufacturing practices, product samples, labeling specimens, and any other information required by FDA.” Petrs’ Br. 43. However, that section, § 387j(b)(1), details what must be included in an application—not the forms of evidence relevant to the APPH standard, which are found in 21 U.S.C. § 387j(c)(4). Given that there are multiple independent bases on

8

which to deny an application, only one of which involves the APPH standard—*see id.* § 387j(c)(2); *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1215 (D.C. Cir. 2023) (TCA provides "four distinct grounds under which the agency may deny such applications")—it logically follows that not all evidence required to be submitted will be relevant to the APPH determination.

Second, Petitioners cite to 21 U.S.C. § 387g(a)(4) to argue that FDA's reviews failed to consider factors the statute requires, "such as whether a product results in relatively less exposure to hazardous constituents." Petrs' Br. 43. Section 387g(a)(4) governs the promulgation of tobacco product standards—not application reviews— and simply lists measures that could be included in a product standard "where appropriate." 21 U.S.C. 387g(a)(4) ("A tobacco product standard . . . (A) shall include provisions that are appropriate for the protection of the public health, including provisions where appropriate…"). Contrary to Petitioners' claim, FDA's conclusion that Petitioners' products are not APPH was based on the statutorily relevant factors outlined in the TCA.

### B. FDA reasonably concluded that Petitioners' products are not APPH.

#### 1. Petitioners' flavored e-cigarettes, including menthol, are attractive to youth.

E-cigarettes are the most commonly used tobacco product among youth. TPL Review 12. According to the National Youth Tobacco Survey ("NYTS"), in 2022,

over 2.5 million youth, including 14.1% of high schoolers, reported current e-cigarette use. TPL Review 12, 16.

Flavors, including menthol, drive these high rates of youth e-cigarette usage. TPL Review 12. As FDA found in its TPL Reviews, "the flavoring in tobacco products (including ENDS) make them more palatable for novice youth and young adults, which can lead to initiation, more frequent and repeated use, and eventually established regular use." TPL Review 13. In 2022, 85.5% of high school e-cigarette users and 81.5% of middle school users reported using a flavored product. TPL Review 12. Moreover, over 93% of youth users reported that their first e-cigarette product was flavored (compared to 54.9% of e-cigarette users aged 25 years and older), and over 70% of current youth e-cigarette users reported using e-cigarettes *because* of flavors. TPL Review 13. As federal appeals courts have recognized in other MDO cases, flavored e-cigarettes "especially appeal to children" *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 505 (6th Cir. 2021) and "lie at the heart of the problem" of youth e-cigarette use. *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 11 (D.C. Cir. 2022).

Some of Petitioners' products are menthol-flavored, which FDA correctly concluded pose a "substantial risk of youth appeal and use," similar to other flavors. TPL Review 9-10 & n.ix. In 2022, 26.6% of current youth flavored e-cigarette users reported use of a menthol product, similar to the rates for mint (29.4%) and

candy/desserts/sweets (38.3%). TPL Review 9 n.ix. As FDA properly concluded, there is "clear evidence of substantial use of menthol-flavored ENDS among youth." *Id.*

Contrary to Petitioners' claim (Petrs' Br. 46) that FDA ignored "its own data indicating that minors were not attracted to or using Petitioners' products," FDA explained why youth are attracted to Petitioners' flavored products and likely to use them if authorized. As discussed at length in the TPLs and MDOs, Petitioners' products have the central feature—flavors—that makes e-cigarettes attractive to youth. *See, e.g.*, Breeze Smoke MDO 1 ("There is substantial evidence that flavored ENDS, like the subject products, have significant appeal to youth and are associated with youth initiation and use); TPL Review 14 ("The preference for use of flavored ENDS among youth is consistently demonstrated across large, national surveys and longitudinal cohort studies."). As the Supreme Court observed in *Wages*, "[o]ne particular feature of e-cigarette products appears to drive this youth demand: the panoply of e-liquid flavors." 604 U.S. at 555.

FDA also explained that the preference and popularity of particular e-cigarettes and device types are "likely dynamic and affected by the marketplace—that is, the options, especially flavors, that are available for consumers to choose from. Thus, as certain product types become harder to obtain, consumers, including youth, may switch to less popular products that are more readily attainable." TPL

11

Review 14. Therefore, it was entirely reasonable for FDA to conclude that Petitioners' flavored e-cigarettes appeal—and pose a risk—to youth, regardless of the frequency of youth usage of Petitioner's particular products at a specific point in time. Finally, it bears noting that, according to the most recent NYTS (2024), Petitioner Breeze Smoke was the second most popular e-cigarette brand among youth.[6] Nearly one-in-five (19.9%) middle and high schoolers (310,000 students) who currently use e-cigarettes reported use of a Breeze product.[7]

### 2. Petitioners' flavored e-cigarettes pose a direct threat of addiction and other health harms to young people.

The vast majority of Petitioners' products contain nicotine, which is "among the most addictive substances used by humans." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 270 (D.C. Cir. 2019). In its TPL Reviews, FDA explained that it is "during adolescence when the developing brain is most vulnerable to nicotine addiction." TPL Review 11. Nicotine's grip over young people is borne out by the numbers. In 2022, 46% of high school e-cigarette users reported using e-cigarettes on at least 20 of the preceding 30 days. TPL Review 15. Even more alarming, 30.1% of high school e-cigarette users reported *daily* use, a strong indication of nicotine addiction. TPL Review 15. Moreover, as FDA observed (TPL Review 15) and as shown in

---

[6] Park-Lee et al., *supra* note 2, at 775 tbl.

[7] *Id.*

Chart 1, the data suggest that nicotine dependence among young people was increasing during the relevant time period.

**Chart 1**



Frequent (20+ days/month) & Daily E-Cigarette Use Among High School E-Cigarette Users 2014-2024

\* 2021 NYTS data is not comparable to other years due to methodological differences.

Source:  CDC, National Youth Tobacco Survey (NYTS), frequent use=20+days/month

The TPL Reviews also noted that the scientific literature indicates that flavors in e-cigarettes, including menthol, "not only facilitate initiation but also promote established regular ENDS use." TPL Review 13. Flavors make e-cigarettes and other tobacco products "more palatable for novice youth and young adults, which can lead to initiation, more frequent and repeated use, and eventually established regular use." *Id.* "Research also shows that flavors can increase nicotine exposure by potentially

13

influencing the rate of nicotine absorption through pH effects and by promoting the reward of ENDS use." *Id.* FDA concluded that, "[t]ogether, this evidence suggests flavored ENDS may pose greater addiction risk relative to tobacco flavored ENDS, which increases concerns of addiction in youth." *Id.* As the D.C. Circuit found in *Prohibition Juice*, "[a] vast body of scientific evidence shows that flavors encourage youth to try e-cigarettes and, together with the nicotine, keep them coming back." 45 F.4th at 11.

In addition to the risk of addiction, FDA found that youth exposure to nicotine "can induce short and long-term deficits in attention, learning, and memory." TPL Review 15. FDA cited other health harms from e-cigarettes as well, including "associations between ENDS use and self-reported history of asthma, chronic bronchitis, emphysema, or chronic obstructive pulmonary disease with increased ENDS use (i.e., daily use) relating to increased odds of disease." TPL Review 16.

FDA also noted the data documenting a risk of progression from e-cigarettes to other tobacco products. *See* TPL Review 15-16. The TPL Reviews cite a "systematic review and meta-analysis that summarized nine prospective cohort studies" finding "significantly higher odds of smoking initiation . . . and past 30-day combusted cigarette use . . . among youth who had used ENDs as compared to youth who had not used ENDS." TPL Review 15. A 2018 report by the National Academies of Sciences, Engineering, and Medicine, cited in the TPL Reviews,

14

found "substantial evidence that ENDS use increases [the] risk of ever using combusted tobacco cigarettes among youth and young adults." TPL Review 15-16. Thus, Petitioners' flavored e-cigarettes pose not just a short-term health threat, but also threaten a young person's future health by increasing the risk that they will progress to a lifetime of addiction to even more hazardous tobacco products.

**3.     Given the APPH standard, it was reasonable for FDA to require robust evidence that Petitioners' flavored e-cigarettes help smokers to stop smoking more effectively than tobacco-flavored products.**

Precisely because the evidence that flavored e-cigarettes appeal to youth is so "robust and consistent," TPL Review 14, it was reasonable for FDA to require similarly "robust and reliable" evidence showing that Petitioner's flavored e-cigarettes help smokers stop smoking more effectively than tobacco-flavored products, and that such a benefit be "substantial enough to overcome the significant risk of youth uptake and use posed by the flavored ENDS product." TPL Review 17-18. Petitioners' evidence fell short.

FDA found that, "in contrast to the evidence related to youth initiation—which shows clear and consistent patterns of real-world use that supports strong conclusions—the evidence regarding the role of flavors in promoting switching among adult smokers is far from conclusive." TPL Review 19. As the Fourth Circuit noted when considering a similar MDO, the "literature was conflicting and

15

inconclusive on whether flavors actually promoted switching or cessation by adult smokers." *Avail Vapor, LLC v. FDA*, 55 F.4th 409, 421 (4th Cir. 2022). Given the lack of consistency in the general literature, it was entirely reasonable for FDA to require Petitioners to demonstrate the effectiveness of their flavored products in helping smokers stop smoking through randomized controlled trials, longitudinal cohort studies, or other similarly rigorous studies.

Rather than submitting such studies, some (but not all) of the Petitioners submitted "consumer use surveys" that Petitioners allege "indicated adult former smokers were using those manufacturers' ENDS products." Petrs' Br. 47.[8] As the TPLs explain, these surveys are insufficient to demonstrate that Petitioners' flavored e-cigarettes better enable cigarette smokers to stop smoking than tobacco-flavored products. *See* TPL Review 20-22. Petitioners' surveys "entail a one-time assessment of self-reported outcomes" which does not allow for a "reliable evaluation of

---

[8] It appears the other Petitioners did not submit any product-specific data regarding their products' ability to switch cigarette smokers to their flavored e-cigarettes. As explained in the TPL Reviews, product-specific evidence is necessary because the general scientific literature is mixed on this issue, which is "likely due to the fact the effectiveness of a product in promoting switching among smokers arises from a combination of its product features—including labeled characteristics like flavor and nicotine concentration—as well as the sensory and subjective experience of use (taste, throat hit, nicotine delivery), and can also be influenced by how the device itself looks and feels to the user." TPL Review 21. It also is noteworthy that Petitioners decry FDA's failure to cite product-specific evidence of youth appeal, yet some of them failed to produce such evidence of a benefit to smokers from Petitioners' flavored products.

behavior change over time." TPL Review 21. For example, Petitioners' consumer use surveys tell us nothing about whether these former smokers used Petitioners' products to switch from cigarettes, only that they were using Petitioners' e-cigarettes at the time of the survey. Based on this data, FDA would have no way of knowing if, for example, these former smokers stopped all tobacco product use for some period, and then actually reinitiated tobacco use with Petitioners' products. The TPL Reviews explained in detail why it is necessary to perform studies, such as randomized controlled trials or longitudinal cohort studies, that "enable direct assessment of behavioral outcomes associated with actual product use over time," TPL Review 21, which Petitioners' surveys do not do.

Contrary to Petitioners' characterization, FDA did not deny these applications "based on the alleged absence of a few selected data points." Petrs' Br. 44. Rather, FDA's requirement of robust evidence of a benefit to smokers from Petitioners' flavored products was entirely reasonable—and at the core of the TCA's APPH standard. If flavored products yield no greater benefit than unflavored products in helping smokers to stop smoking, but have the serious added harm of enticing children to begin using ENDS, then there can be no net public health benefit from authorizing flavored products. Rather, the increased youth initiation from flavored products would be a clear public health detriment.

17

II.   **FDA's Requirement of Strong Evidence that Petitioners' Flavored E-Cigarettes More Effectively Help Smokers to Stop Smoking than Tobacco-Flavored Products Was Not Required to Go Through Notice-and-Comment Rulemaking.**

A.   **FDA's Evidentiary Requirement Is Not a Product Standard Under the TCA.**

According to Petitioners, FDA's requirement of strong evidence that flavored products help smokers stop smoking cigarettes more effectively than tobacco-flavored products is itself a tobacco product standard, requiring notice-and-comment rulemaking. Petrs' Br. 50-57. Petitioners' argument fundamentally misunderstands the nature of a product standard under the TCA.

Pursuant to 21 U.S.C. § 387g, FDA has the authority to set product standards if the agency can demonstrate that they are APPH, a required showing that parallels the showing companies generally must make to market new tobacco products under 21 U.S.C. § 387j. *Compare* 21 U.S.C. § 387g(a)(3)(A) ("The Secretary may adopt tobacco product standards…if…appropriate for the protection of the public health"), *with id.* § 387j(c)(2) ("The Secretary shall deny an application…if…there is a lack of showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health."). Under section 387g, a product standard is a rule that restricts the manufacture of products with certain properties, whether those products are "new" products (first marketed after February 15, 2007) or not. That section itself establishes a product standard (the "Special Rule for

18

Cigarettes") prohibiting flavors in cigarettes, providing that they "shall not contain, as a constituent (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice . . . that is a characterizing flavor of the tobacco product or tobacco smoke."  21 U.S.C. § 387g(a)(1)(A).

Section 387g grants FDA the authority to "adopt product standards in addition to" the cigarette "Special Rule" if shown to be APPH. *Id.* § 387g(a)(3)(A). It provides that a product standard "shall, where appropriate for the protection of the public health, include provisions respecting the construction, components, ingredients, additives, constituents, including smoke constituents, and properties of the tobacco product." *Id.* § 387g(a)(4)(B); *see also U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428, 433 (2d Cir. 2013) (In section 387g, Congress "banned the use of flavoring additives in cigarettes and authorized the FDA to prohibit the use of other ingredients in tobacco products if it deems them particularly harmful to the public health.").

By requiring strong evidence of a benefit of non-tobacco-flavored products in helping cigarette smokers to stop smoking for purposes of a marketing order under 21 U.S.C. 387j, FDA has not prohibited the manufacture of e-cigarettes with such flavors, as a product standard would do. Instead, the agency has set forth the kind of evidence that may be sufficient to market new flavored products *in the absence of a product standard* prohibiting those flavors. And, as even Petitioners seem to

19

acknowledge, FDA has determined that some flavored e-cigarettes have met this burden and those products have been authorized. *See* Petrs' Br. 67 (asserting that MDOs have been issued for "virtually" every product "with a menthol characterizing flavor"). In fact, six of the 39 authorized e-cigarettes are non-tobacco-flavored.[9] This fact undercuts Petitioners' puzzling assertion that FDA has "effectively restrict[ed] and/or bann[ed] all non-tobacco flavors," Petrs' Br. 51, and distinguishes this case from *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023), which was decided before FDA had authorized any flavored e-cigarettes and was expressly premised on the Court's conclusion that FDA had not granted "a single application to market non-tobacco-flavored e-cigarettes" *id.* at 192, which is no longer true. Thus, as these authorizations further illustrate, FDA's requirement of rigorous studies showing that specific flavored e-cigarette products help smokers stop smoking for purposes of product review is not a tobacco product standard subject to notice-and-comment rulemaking.

### B.   FDA's Evidentiary Requirement Was Not Required to Go Through Notice-and-Comment Rulemaking Under the APA.

Contrary to Petitioners' assertion (Petrs' Br. 58-62), FDA's requirement that Petitioners submit strong evidence demonstrating that their flavored e-cigarettes

---

[9] FDA, *E-Cigarettes Authorized by the FDA* (last updated July 2025), https://digitalmedia.hhs.gov/tobacco/hosted/Authorized-E-Cig-July2025.pdf [https://perma.cc/6L8F-WLSG].

Case: 24-60332   Document: 142   Page: 30   Date Filed: 01/09/2026

more effectively help smokers to stop smoking than tobacco-flavored products was not required to go through notice-and-comment rulemaking under the APA. This evidentiary requirement, which flows directly from the Tobacco Control Act, is an interpretive rule exempt from APA notice-and-comment rulemaking. And, even if the Court were to find this requirement to be a new regulatory standard, FDA was free to implement it through adjudication.

Unless required by statute, the APA exempts "interpretive rules" from notice-and-comment rulemaking. 5 U.S.C. 553(b)(A). "An interpretive rule is 'one that clarifies, rather than creates, law.'" *Flight Training Int'l, Inc. v. Federal Aviation Administration*, 58 F.4th 234, 240 (5th Cir. 2023) (quoting *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 602 (5th Cir. 1995)). Such rules "advise the public of the agency's construction of the statutes and rules which it administers." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015)).

Here, FDA's requirement for robust and reliable evidence demonstrating that Petitioners' flavored e-cigarettes more effectively help adult smokers to stop smoking than comparable tobacco-flavored products flows directly from the Tobacco Control Act.[10] The TCA requires FDA's determination about whether a

---

[10] And as discussed *supra* 18-20, the TCA does not mandate that this requirement be promulgated through notice-and-comment rulemaking.

21

product is APPH to be based on, "when appropriate," "well-controlled investigations" and other "valid scientific evidence" that "is sufficient to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5); *see also Wages*, 604 U.S. at 571-72. As the Supreme Court confirmed in *Wages*, the "TCA leaves it to the FDA to decide what constitutes a 'well-controlled investigation[n]' or other 'valid scientific evidence' that is 'sufficient." 604 U.S. at 572. FDA's requirement that Petitioners' evidence be in the form of a randomized controlled trial, longitudinal cohort study, or other study design that provides "robust and reliable" evidence (TPL Review 18) is a paradigmatic interpretive rule, as it "explain[s] what [the] agency thinks a statute . . . actually says." *Flight Training*, 58 F.4th at 242.

The Court should also reject Petitioners' argument that FDA's evidentiary requirement "is a legislative rule requiring notice-and-comment rulemaking as it plainly limited what FDA could consider in each PMTA and afforded little discretion when a comparative efficacy study was missing." Petrs' Br. 59. As a factual matter, FDA's review was not nearly as circumscribed as Petitioners portray. In addition to randomized controlled trials and longitudinal cohort studies, FDA also "consider[ed] other evidence that reliably and robustly evaluated the impact of the new flavored vs. tobacco-flavored products on complete switching or significant cigarette reduction over time." Breeze MDO 2. Moreover, this Court has previously "join[ed] other Circuits in rejecting the proposition that a rule cannot be interpretive if it limits

22

discretion or uses binding language." *Flight Training*, 58 F.4th at 242. "If the law is mandatory"—as it is here, *see* 21 U.S.C. § 387j(5)(A) ("whether permitting a tobacco product to be marketed would be" APPH "*shall*, when appropriate be determined on the basis of well-controlled investigations . . . ") (emphasis added)— "then it is natural for an agency's restatement of the law to speak in mandatory terms as well." *Flight Training*, 58 F.4th at 242.

To the extent Petitioners take issue with the requirement that they compare their flavored e-cigarettes to a tobacco-flavored product in terms of the benefit to adult smokers, the Supreme Court has already found that this comparative requirement comes directly from the Tobacco Control Act. The "TCA expressly contemplates comparisons of different tobacco products" and "FDA's determination that a new tobacco product is" APPH "is an inherently comparative judgment." *Wages*, 604 U.S. at 578-79 (citing 21 U.S.C. § 387j(c)(4)).

Finally, even if this Court were to find FDA's requirement that flavored e-cigarettes demonstrate a strong benefit to adult smokers to be a new regulatory standard, the Supreme Court recently reaffirmed in *Wages* that "[u]nless Congress has specified otherwise, agencies are generally free to develop regulatory standards 'either by general [legislative] rule or by individual order' in an adjudication. 604 U.S. at 565 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202-203 (1947)). As the Supreme Court "explained, the FDA had discretion to work out the meaning of the

TCA's comparative standard when evaluating premarket tobacco product applications. A contrary rule would be in tension with *Chenery II's* teaching that, absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking." *Id.* at 582. (citations omitted). The TCA contains no such prohibition, *see supra* 18-20, and as such, FDA was free to develop its evidentiary requirements through adjudications. In short, nothing in the TCA or APA required FDA to engage in notice-and-comment rulemaking.

### III.   FDA Did Not Violate the Major Questions Doctrine

This Court should reject Petitioners' argument that FDA's application reviews violate the major questions doctrine by "mak[ing] an industry-wide finding that non-tobacco flavored ENDS fail under the APPH standard—i.e., to institute a de facto restriction or ban on those products." Petrs' Br. 72. Petitioners' argument is premised on the demonstrably false assertion that no flavored e-cigarette can satisfy the APPH standard. In reality, six of the 39 e-cigarettes (15%) that FDA has found to have met the APPH standard have a characterizing flavor other than tobacco.[11] FDA's denial of Petitioners' application was not the result of some de facto ban on flavored e-cigarettes. Instead, it reflects the lack of any strong evidence in Petitioners' applications that their flavored products are more effective than tobacco-flavored

---

[11] *E-Cigarettes Authorized by FDA*, *supra* note 9.

products in helping smokers to stop smoking, sufficient to outweigh the added risk to kids posed by Petitioners' flavored e-cigarettes. *E.g.*, Breeze MDO 1-2.

In the TCA, Congress was clear that FDA "*shall* deny an application" to market a new tobacco product unless it is shown to be APPH. 21 U.S.C. § 387j(c)(2)(emphasis added). That is precisely what has occurred here. FDA has issued denial orders to e-cigarettes—both in tobacco and other flavors—that the agency has determined do not meet the APPH standard. [12] Meanwhile, the agency has authorized e-cigarettes, including those in flavors other than tobacco, that it determined are APPH (and that FDA determined satisfied the other requirements for authorization, *see* 21 U.S.C. § 387j).[13] Congress spoke clearly in 21 U.S.C. § 387j(c)—and FDA has implemented those words by denying authorization to Petitioners' products for failing to meet the APPH standard.

---

[12] *See, e.g.*, FDA, *FDA Denies Marketing for 65 "MNGO Disposable Stick" E-Cigarettes* (Apr. 15, 2024), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-denies-marketing-65-mngo-disposable-stick-e-cigarettes (MDO for e-cigarettes in flavors including tobacco, menthol, and pink lemonade that failed to satisfy the APPH standard).

[13] *See, e.g.*, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://www.fda.gov/news-events/press-announcements/fda-authorizes-marketing-four-menthol-flavored-e-cigarette-products-after-extensive-scientific.

## CONCLUSION

For these reasons, and those presented by the government, *amici* urge the

Court to uphold FDA's denial orders.


Date: January 9, 2026                    Respectfully submitted,

                                         Dennis A. Henigan
                                         */s/ Connor Fuchs*
                                         Connor Fuchs
                                         CAMPAIGN FOR TOBACCO-FREE KIDS
                                         1400 I St. NW, Suite 1200
                                         Washington, DC 20005
                                         Tel: (202) 481-9366
                                         Fax: (202) 296-5427
                                         dhenigan@tobaccofreekids.org
                                         cfuchs@tobaccofreekids.org

                                         *Counsel for Amici Curiae*

26

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

- this document contains 5,748 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

- this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.104 in 14-point Times New Roman font.

*/s/ Connor Fuchs*
Connor Fuchs
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, I filed the foregoing via the CM/ECF system, which will send a Notification of Electronic Filing to all counsel of record.

*/s/ Connor Fuchs*
Connor Fuchs
*Counsel for Amici Curiae*